## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AL HAMILTON CONTRACTING CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-212 |
| | ) |
| DIRK KEMPTHORNE, Secretary of the | ) |
| United States Department of the Interior, | ) Judge Kim R. Gibson |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER OF COURT

This matter comes before the Court on cross motions for summary judgment filed by the

Plaintiff, Al Hamilton Contracting ("Hamilton"), and Defendant, Secretary of the Department of the

Interior ("Secretary"). Hamilton brings this case seeking judicial review of an administrative

decision by the Interior Board of Land Appeals ("the Board"), pursuant to 30 U.S.C. § 1276(a)(2).

Since neither discovery nor trial is authorized pursuant to 30 U.S.C. § 1276(b) and Federal Rule of

Civil Procedure 26(a)(1)(B), the parties were not required to file statements of material facts in

support of their motions for summary judgment. Furthermore, no material facts are in dispute. The

parties have filed their briefs and responses, and thus the summary judgment motions are ripe for

disposition. For the forthcoming reasons, this Court will grant Plaintiff's Motion and deny

Defendant's Motion.

## I. BACKGROUND

### A. STATUTORY AND REGULATORY HISTORY

In 1977, Congress enacted the Surface Mining Control and Reclamation Act ("SMCRA"),

1

30 U.S.C. §1201, *et seq*. SMCRA was enacted to provide protection against environmental degradation from coal mining and to cleanup areas from past mining operations. "It is the purpose of this Act to . . . establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations . . . ." 30 U.S.C. § 1202(a). The Secretary of the Interior, through the Office of Surface Mining Reclamation and Enforcement ("OSM"), is required to administer the programs required by SMCRA. 30 U.S.C. § 1211. However, Congress stated that in enacting SMCRA, "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States." 30 U.S.C. § 1201(f). Through this system of cooperative federalism, a state may choose to take the lead in the regulation while the federal government takes a role as overseer. A state whose enforcement program has been approved by the Secretary is said to have achieved "primacy" over the regulation of its surface mining program under SMCRA. Pennsylvania attained primacy on July 31, 1982. 30 C.F.R. § 938.10.

Under this system of cooperative federalism, OSM has limited oversight over the States that have achieved primacy. OSM's ability to take an enforcement action under its residual oversight authority is expressly conditioned on its first performing a federal inspection under 30 U.S.C. §1271(a)(1). Subject to the exception of an imminent danger of significant environmental harm or harm to the public health or safety, a federal inspection may be conducted only if OSM: (1) has reason to believe that there is a violation of SMCRA; (2) notifies the State of the possible violation by issuing a Ten-Day Notice ("TDN"); and (3) determines that the state has failed "to take appropriate action to cause a violation to be corrected" or has failed to show "good cause" for failing to take appropriate action. When all three of these elements are present, a federal inspection can be

2

conducted and a notice of violation ("NOV") issued based on that inspection.  30 C.F.R. §842.11(b)(1)(ii)(B)(2).

## B. ENFORCEMENT HISTORY AT HAMILTON'S CALEDONIA PIKE MINE

Since this is a review of the decision of the Board, the facts are all taken from the record below, which is undisputed. On May 23, 1977 the Pennsylvania State Department of Environmental Resources ("PADER")[1] issued a Mine Drainage Permit ("MDP") for the Caledonia Pike mine which placed certain limitations on the acid mine drainage ("AMD") that would be permitted. *Al Hamilton Contracting Co. v. OSM*, 172 IBLA 83, 89 (2007).[2]  On May 11, 1984, PADER issued a Surface Mining Permit ("SMP") for the Caledonia Pike mine, which authorized discharge from the mine to two unnamed tributaries of Sandy Creek and Grimes Run to Mosquito Creek subject to restrictions. *Id.* at 90. Beginning around July of 1981, AMD flowed into the unnamed tributaries of Grimes Run, which is located to the north and northeast of the Caledonia Pike mine site. Id. After the failure of an abatement plan in 1987, PADER required Hamilton to submit a new abatement plan. *Id.*  In January of 1988, Hamilton proposed to construct "beaver ponds" for passive treatment and to study and identify "hot spots" within the site to determine additional necessary abatement practices. *Id.*

On February 22, 1988, PADER issued Compliance Order 88H008 ("Compliance Order") to Hamilton for allowing water discharge from its mine site, in violation of applicable effluent AMD limitations and the State code. *Id.* at 90. The discharges occurred in six areas along the east side of the permitted area; PADER contended these six areas were either on or hydrogeologically connected to the site and drained towards Grimes Run. *Id.* at 91. The Compliance Order required formulation

---

[1]PADER has since been renamed the Department of Environmental Protection.

[2]Citation to the Board's decision will be to the IBLA publication.

3

and implementation of a plan for treatment of all discharges from areas disturbed by mining that were in violation of effluent standard. *Id.* Hamilton appealed the Compliance Order to the State Environmental Hearing Board ("PAEHB") and contemporaneously proposed interim and permanent compliance abatement plans. *Id.* The interim plan was approved by PADER on May 11, 1988. *Id.* On August 1, 1988, PADER approved of the technical aspects of Hamilton's permanent abatement proposal. *Id.*

On September 20, 1988, OSM issued a TDN to PADER citing a citizen complaint that gave reason to believe a violation existed at the Caledonia Pike mine site. *Id.* A joint OSM/PADER inspection was conducted on September 29, 1988, that revealed the "beaver ponds" Hamilton was using to treat the AMD were leaking from their base. *Id.* Additionally, the inspection found that the beaver ponds were located off the permit area such that Hamilton was conducting mining activities outside the bounds of their permit. *Id.* On October 21, 1988, PADER notified Hamilton by letter that the untreated leakage from the "beaver ponds" required them to withdraw the "satisfactory progress" status from the Compliance Order. *Id.* at 92. On December 1, 1988, an inspection revealed that the "beaver ponds" were still leaking at their bases. *Id.* at 93. "The PADER supervisor stated that due to the uncertainty regarding the source of the effluent below the southern and western beaver pond sumps, PADER was going to require Hamilton to conduct a hydrologic study of the entire area. On December 15, 1988, PADER advised OSM that 'recent field evaluations by our technical staff has failed to determine the specific source of water emerging in the stream channels below both 'beaver dams.' We are therefore unable to determine that a violation exists and are returning [Hamilton] to a satisfactory progress status.'" *Id.* at 93 (quoting Ex. R-33).

In April of 1989, OSM issued a determination that PADER's response to the TDN was

4

appropriate and advised the party filing the citizen's complaint that it would continue to monitor PADER's enforcement. *Id.* "On June 15, 1990, Hamilton notified PADER that it did 'not intend to construct a wetland as previously proposed.' It advised that instead it was 'treating the six discharges cited in Compliance Order #88H008, as well as considerable volumes of flow exceeding the burden of treatment required by the Compliance Order,' by intercepting all waters at the collection sumps and treating them to meet effluent standards." *Id.* at 94 (quoting Ex. R-44). PADER initially refused to accept the revised plan; however, on November 14, 1990, "PADER approved 'the system as an acceptable permanent chemical treatment system on the condition that Hamilton notify PADER of the first sludge disposal activities." *Id.* (quoting Ex. R-50).

In September and October of 1990, the PAEHB held hearings related to Hamilton's appeal of the Compliance Order. *Id.* On October 29, 1992, the PAEHB issued an Order that ruled a topographical map offered by PADER was inadmissible as evidence. *Id.* PADER contended that the map represented the boundaries of Hamilton's Caledonia Pike MDP and the six discharge areas that were subject of PADER's Compliance Order. *Id.* The PAEHB found that the map was inadmissable under "the best evidence rule" and the "*Frye* test"[3] for scientific evidence. Id. On December 24, 1992, the PAEHB ruled that PADER failed to present a *prima facie* case of liability against Hamilton for five of the six discharge areas, however, PADER did make a *prima facie* showing with respect to the sixth discharge. Id. at 95. The PAEHB stated that since the topographical map offered by PADER was inadmissable and no other evidence was presented, PADER failed to provide proof that the discharges are located on or hydrogeologically connected to Hamilton's

---

[3]The *Frye* test remains the test for expert scientific evidence under Pennsylvania's Rules of Evidence. *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1044 (Pa. 2003).

mining operation. Id. The PAEHB adopted the December 24, 1992 opinion and affirmed the action on April 1, 1993. Id. at 96. On July 27, 1994, the PAEHB decided, as to the sixth discharge, that although PADER had presented a *prima facie* case, the evidence as a whole failed to establish sufficient grounds to find that the discharge was located within the area encompassed by Hamilton's permit, thus concluding that Hamilton was not liable for the discharge emanating from that area. *Id.* PADER subsequently appealed the PAEHB's final ruling to the Commonwealth Court of Pennsylvania, which ultimately affirmed although on different grounds. See *Com. Dept. of Envtl. Res. v. Al Hamilton Contracting Co.*, 665 A.2d 849 (Pa. Cmwlth. 1995).

On August 1, 1994, in response to the PAEHB's decision, Hamilton stopped treating the discharges from the Caledonia Pike mine site. 172 IBLA at 96. "On September 1, 1994, OSM Inspector Isaacson conducted a joint follow-up investigation of the Caledonia Pike mine site with PADER and confirmed that water treatment had stopped, noting that PADER planned to take no further action on the site pending its appeal of the PAEHB decision." *Id.* On October 19, 1994, OSM advised PADER that its actions regarding the discharges into the Grimes Run tributaries were no longer effective, since treatment had stopped following the PAEHB decision. *Id.* Thus, OSM deemed PADER's response as "not appropriate." *Id.* Inspector Isaacson had not read the PAEHB adjudication decision at the time he made the recommendation that PADER's actions be deemed "not appropriate." *Id.* at 118 (Jackson, J., dissenting)(citing Tr. at 328-29). On November 18, 1994, OSM inspector Isaacson and hydrologist Donald Stump inspected the mine site, which led them to conclude that water was being allowed to leave the permit area of the beaver dams in violation of the applicable effluent standards. *Id.* at 96. "The source of this discharge was determined to be the same source cited by PADER in Compliance Order 88H008." *Id.* at 97. The November 18, 1994

6

investigation resulted in the issuance of NOV 94-121-377-01 on December 5, 1994. *Id.* As a result of the NOV, Hamilton placed a liner in the beaver ponds which stopped the leakage and on March 9, 1995, Isaacson terminated the NOV pertaining to the Grimes Run Discharges. Id.

Concurrent with the events involving the Grimes Run discharge, the OSM was also investigating a second discharge. Inspector Isaacson investigated the southwest area of the site near Sandy Creek on September 22, 1994. Id. at 97. Isaacson found that there was a discharge from the mine site that failed to meet the effluent limitations. Id. On October 13, 1994, OSM sent PADER a TDN with respect to the Sandy Creek discharge. Id. PADER, after initially stating that it was conducting a hydrogeologic investigation, notified OSM that it would not be providing any further responses to the TDN. Id. On December 16, 1994, OSM advised PADER that the Sandy Creek violation was still occurring and PADER had not taken appropriate action to correct the violation or present good cause for failing to do so. Id. at 97-98. On February 2, 1995, OSM conducted a formal inspection of the area of the southwest side of the permit area and determined that water in violation of the applicable effluent limitations was discharging into an unnamed tributary to Sandy Creek. Id. at 98. As a result, OSM issued NOV 95-121-377-01 for that violation to Hamilton on February 14, 1995. *Id.* Hamilton effectively treated the cited AMD discharges on the southwest portion of its mine site, and OSM terminated that NOV as abated on April 21, 1995. *Id.*

In January and March of 1995, Hamilton filed timely applications for review of the OSM's Grimes Run NOV and Sandy Creek NOV. *Id.* The applications were consolidated and a joint hearing was held before Administrative Law Judge Greenia on February 14-16, 2000. *Id.* On March 20, 2002, Judge Greenia issued a decision sustaining both NOVs, holding that OSM established at the hearing that the discharges were connected with Hamilton's then current surface mining permits.

7

*Id.* at 100. Judge Greenia additionally rejected Hamilton's argument that it should have been granted summary judgment because the PAEHB decision and the State appellate court decision affirming it constituted "good cause" for PADER's failure to take action to cause the violations to be corrected under 30 C.F.R. §842.11(b)(1)(ii)(B)(4)(iv). *Id.* Judge Greenia stated that "the OSM is required to defer to the ruling of a state that no violation exists unless it determines the ruling is arbitrary, capricious, or an abuse of discretion of the state program." *Id.* "[Judge Greenia] noted that neither the PAEHB adjudication nor the decision of the Commonwealth Court of Pennsylvania found that the discharge violations did not exist, and that they did not rule on the merits of PADER's allegations in any way. [The ALJ] concluded that, given the full particulars of the PAEHB and the state court rulings, PADER's reliance on the PAEHB decision as the basis for its failure to take action to cause the violations to be corrected was arbitrary and capricious." *Id.* Judge Greenia also held that Hamilton lacked standing to challenge the OSM's TDN because the TDN is neither a jurisdictional prerequisite to the issuance of an NOV nor an essential element in establishing a *prima facie* case. *Id.* at 101.

Hamilton timely appealed Judge Greenia's decision to the Interior Board of Land Appeals. In a two to one decision, the Board affirmed the OSM's NOVs and held that although Hamilton did have standing to challenge the OSM's TDN, the OSM properly determined that PADER did not take appropriate action or show good cause in its failure to respond to the Grimes Creek violation. *Id.* at 102-03.

## II. Standard of Review

30 U.S.C. § 1276(a)(2) provides for judicial review on any order or decision issued by the Secretary pursuant to 5 U.S.C. § 554. The Board is an authorized representative for the Secretary.

8

43 C.F.R. § 4.1(b)(3). Pursuant to 30 U.S.C. § 1276(b), "[t]he court shall hear such petition or complaint solely on the record made before the Secretary," and "the findings of the Secretary if supported by substantial evidence on the record considered as a whole, shall be conclusive."

Hamilton does not challenge the factual findings of the Secretary; rather, Hamilton seeks judicial review of the Secretary's interpretation and application of the agency's regulations to the uncontested facts. Where an agency's interpretation of its own regulation is at issue, substantial deference is given by the reviewing court. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 2386, 129 L. Ed. 2d 405, 414 (1994).

> Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Udall v. Tallman*, 380 U.S. 1, 16 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988).

*Id.*. Therefore, the decision of the Board will be affirmed unless interpretation and application of the agency's regulations are plainly erroneous or inconsistent with other regulations.

**III. Analysis**

Hamilton's appeal of the Grimes Run NOV turns on whether the Board's decision that PADER's appeal did not constitute an "appropriate action" to cause a violation to be corrected was plainly erroneous and whether the decision that PAEHB's final decision did not constitute "good cause" for failure to correct the violation was plainly erroneous or inconsistent with other regulations of SMCRA..

9

The relevant section within the Code of Federal Regulations reads as follows:

> (2) For purposes of this subchapter, an action or response by a State Regulatory authority that is not arbitrary, capricious, or an abuse of discretion under the state program shall be considered "appropriate action" to cause a violation to be corrected or "good cause" for failure to do so.
> (3) Appropriate action includes enforcement or other action authorized under the State program to cause the violation to be corrected.
> (4) Good cause includes . . . (iv) the State regulatory authority is precluded by an administrative or judicial body or court of competent jurisdiction from action on the possible violation, where that order is based on the violation not existing . . .

30 C.F.R. § 842.11(b)(1)(ii)(B).

As an initial matter, the characterization of the PAEHB decision and the "on-going" nature of the violation must be discussed, as it touches upon both the "appropriate action" and "good cause" analyses. The Board seems to have characterized the Grimes Run discharges as an "on-going" violation that, once Hamilton stopped treating in 1994, resulted in a new violation to which PADER could issue a new compliance order. There is no dispute that the sources of the discharges in the 1994 TDN were the same as from the 1988 Compliance Order. 172 IBLA at 96-97. However, the Board stated that the PAEHB's decision was only for the events occurring in 1988 and when Hamilton stopped treating the discharges in 1994, there was a new violation that PADER failed to enforce. This mischaracterizes both the nature of the discharges and the effect of the PAEHB decision.

That the discharge reappeared when Hamilton stopped treatment should not have been a surprise. This discharge, while having reappeared following cessation of treatment, should not be considered a new violation. The parties never disputed that six discharges into Grimes Run existed;

10

rather, the dispute concerned whether the discharges were on Hamilton's permit or hydrogeologically connected to the permitted site. The decision of the PAEHB was that PADER failed to prove that the discharges were on or connected Hamilton's site. This decision was not made based upon a single point in time discharge as the Board characterized. Instead, the decision was based on the fact that the discharges were not proven to be on or connected to Hamilton's permit, irrespective of time. Therefore, the reappearance of the discharges was not a new violation, but rather the same discharges litigated for six years. Thus, the Board's characterization of the six Grimes Run discharges as "new" is plainly erroneous and unsupported.

As to the effect of the PAEHB decision, the Board held that it did not preclude either PADER or the OSM from seeking enforcement of the ongoing violation. 172 IBLA at 106-07. The Board stated that the PAEHB only decided that the violation in 1988 was not proven by evidence in the correct form, which did not preclude PADER from proving in the future that the discharges exist and Hamilton is responsible for them. Accepting this reasoning would minimize the usefulness of the PAEHB, as it would have no finality. As stated above, the violation was not of an ongoing nature that could be subject to multiple adjudications. Rather, in deciding whether the Grimes Run discharges were on or were hydrogeologically connected to Hamilton's site, the PAEHB concluded that they were not.

To that end, it was plainly erroneous for the Board to hold that the PAEHB decision did not preclude PADER from seeking future enforcement of the six Grimes Run discharges as to Hamilton. The PAEHB held that PADER could not prove Hamilton responsible for those discharges. As the issue was appealed in Pennsylvania courts, those courts affirmed PAEHB's decision. This extensive process, and its decision that Hamilton could not be proved responsible for the six at-issue Grimes

11

Run discharges, must be given some measure of finality. The Board reasoned that PAEHB's final decision, even though affirmed through proper processes, simply could not be the correct result, as it would give Hamilton a permanent exemption from violations on the site. *Id.* at 109. The Board overstates the supposed preclusive effect of the PAEHB decision, as a final decision would only preclude PADER from proving the six Grimes Run discharges were on or connected to Hamilton's site. PADER would of course remain free to prove any other discovered discharges in violation. It is apparent that the PAEHB decision would not have the effect of a total exemption since Hamilton was shown to be responsible for the Sandy Creek discharges.

As noted by Judge Jackson in his dissent, if PADER, in response to the PAEHB decision, attempted to cite Hamilton for the "new" violations at Grime Run, such attempts would have been dismissed and PADER would risked claims of abuse of process and malicious prosecution. *Id.* at 121 n.13 (Jackson, J., dissenting). Thus the only available option PADER appeared to have was to appeal the PAEHB decision. To that end, the Court now considers whether the following OSM decisions were clearly erroneous: 1) that PADER's appeal was not "appropriate action", and 2) that the PAEHB decision was not "good cause" for a failure to correct the violation.

### A. APPROPRIATE ACTION

Hamilton argues that PADER's appeal of the PAEHB decision constituted an "appropriate action" under the regulations and the Board's interpretation to the contrary was a plainly erroneous decision. It appears that the Board did not initially confront the issue of whether PADER's appeal may have been an "appropriate action" under the regulations. The Board seems to have construed PADER's appeal as not an "action" at all. Consequently, the Board moved forward to the "good cause" analysis. "In view of the fact that PADER declined to take *any* enforcement action following

12

OSM's issuance of [the] TDN . . .we must conclude that. . . PADER's 'action and response' was

'arbitrary, capricious, or an abuse of discretion under the State program.'" *Id.* at 105 (emphasis in

original). However, in their analysis of "good cause" the Board provided an analysis of whether

action pending judicial review could constitute "appropriate action" under the regulations.

The 1988 rulemaking of 30 C.F.R. § 842.11 provides explanation as to what "other action

authorized under the State program to cause the violation to be corrected" means:

> [The OSM] rejects the concept that appropriate action to cause
> a violation to be corrected can only include responses showing that at
> the time of the state response either the condition constituting the
> possible violation of the Act no longer exists or the state has issued
> an NOV or cessation order. Instead, [OSM] recognizes that situations
> vary and may, in some cases, either be so complex or otherwise allow
> other actions to resolve the situation. . . .
>
> A State regulatory authority continues to have an obligation
> to take the actions provided in the approved state program to cause a
> violation to be corrected. In most situations, that means issuing an
> NOV. In a few instances, other action may be appropriate, if it is
> authorized by the state program and if it will cause the violation to be
> corrected. . . .
>
> [OSM] is not permitting a "free bite", but is simply saying that
> the federal government will not substitute its judgment and second-
> guess the states on a case-by-case basis, unless the state action is
> arbitrary, capricious or an abuse of discretion under its program. The
> Act entrusts primary implementation of the law in primacy states to
> the state regulatory authority. The Secretary's obligation to inspect
> arises only after the Secretary makes the determination that the state
> has failed to take appropriate action or to show good cause for failing
> to take such action.

53 Fed. Reg. 26,733-734 (July 14, 1988). The rulemaking goes on to give two examples of other

actions: "the initiation of the process to require a revision or modification to the operator's permit"

and "the commencement of a proceeding to forfeit the performance bond." 53 Fed. Reg. 26,734. The

Board decided that these examples acted as limitations on what could be "other action" and that

13

judicial review could not be an appropriate "other action" because it was not mentioned. "Withholding action pending completion of State judicial review of a State enforcement action is not addressed and therefore cannot be deemed to have been recognized by the OSM as being *per se* "appropriate action" to a TDN within the meaning of 30 C.F.R. § 842.11(b)(1)(ii)(B)(3)." 172 IBLA at 108.

The Board's reading of the examples as limitations on what may constitute "other action" is plainly erroneous as the rulemaking makes it clear that "other action" is to be understood as having an open ended meaning. "The language 'other action' clearly shows that the definition is not exhaustive. 'Other action' is confined, however, to actions that are authorized under the state program to cause the violation to be corrected. If the 'other action' cannot meet those criteria, it will not be considered appropriate because it would be arbitrary, capricious, or an abuse of discretion because of inconsistency with the state program." 53 Fed. Reg. 26,734-735. Since "other action" is not exhaustive, it was plainly erroneous and inconsistent with the regulations for the Board to decide that judicial review is not "appropriate action" simply because it was not addressed in the regulations. The correct analysis would be whether the judicial review was authorized under the state program and whether it would cause the violation to be corrected.

The Secretary argues that PADER's appeal is not an appropriate action because it does not necessarily lead to the correction of the violation in a timely manner. The rulemaking explains that the standard to cause a violation to be corrected is not actual abatement. "The rule provides that appropriate action is action to cause the violation to be corrected. Thus, actual abatement is not required within the ten days. Initiating an action within the ten days that would lead to abatement within a reasonable time would also be acceptable." 53 Fed. Reg. 26,734. The Secretary's argument

14

is that since the appeal could not be predicted to necessarily result in abatement, the action could not be said to lead to correction within a reasonable time. However, the inability to predict the outcome of the appeal cannot be a justification for finding that it would not lead to abatement within a reasonable time. If PADER won on appeal, the Compliance Order would have been reinstated and the discharges would have been treated by Hamilton as they were between 1988 and 1994. As Judge Jackson noted in his dissent, Commonwealth Court resolved the case within ten weeks of PAEHB's final order. 172 IBLA at 120 n.12 (Jackson, J. dissenting). It can hardly be said then, that had PADER won, it would not have been within a reasonable time. Furthermore, the argument that appealing the decision would only speculatively lead to abatement is irrelevant, as the same could be said for issuing a compliance order that has the possibility of being vacated. Therefore, appealing an adverse administrative decision in furtherance of an enforcement action must be cognizable as an "appropriate action" under the regulations.

As Judge Jackson stated in his dissent, the Board never discussed why appealing the PAEHB's decision was arbitrary, capricious or abuse of discretion. *Id.* at 119 n.10. In this case, no reason exists as to why appealing the PAEHB's decision in the attempt to restore the Compliance Order could be considered arbitrary or capricious. Instead, the Board erroneously decided not to analyze the appeal as an action. In sum, PADER's appeal of the PAEHB decision must be considered "appropriate action" under 30 C.F.R. §842.11(b)(1)(ii)(B)(3).

## B. GOOD CAUSE

Hamilton also argues that the PAEHB decision constituted "good cause" for PADER not to order Hamilton to treat the Grimes Run discharges. The Board decided that the "good cause" section of 30 C.F.R. §842.11(b)(1)(ii)(B)(4)(iv) did not apply to the PAEHB decision because the order was

15

not an injunction on PADER barring further enforcement. The Board stated "[n]either the administrative decision nor the State court decision barred PADER from returning to the site to address ongoing AMD violations. At most, the final effect of those decisions is limited to a finding that Hamilton was not liable for AMD during the period at issue cited in PADER's compliance orders." 172 IBLA at 109. In support of the reading of the code section as only referring to an injunctive order, the Board cites to the rulemaking. "[OSM] has considered the conflicting comments and court decisions, and believes that a state regulatory authority has good cause for not taking action when it is enjoined from doing so by a state administrative or judicial body acting within the scope of its authority under the state program." 53 Fed. Reg. 26,739. Thus, since the PAEHB decision was not an injunctive order, the Board held there was not "good cause" for their failure to act. 172 IBLA at 109.

The Board went on to say that if the PAEHB's decision prevented PADER from seeking further enforcement of the six discharges into Grimes Run, this would give Hamilton a permanent exemption for those discharges. The Board found that result to be unacceptable, stating "[i]f the State authorities had ruled that PADER's failure to present evidence in the proper format in the 1988 administrative proceeding forever barred it from returning to the site to address ongoing AMD violations, we would not hesitate to conclude that such implied finding 'did not have a proper basis' and therefore did not constitute 'good cause' under 30 C.F.R. § 842.11(b)(1)(ii)(B)(4)(iv)." *Id.* at 109. Therefore, the Board held that the reasoning behind PAEHB's decision would not have been a proper basis to preclude PADER from seeking further enforcement.

The result of the Board's interpretation of the code section as applying only to injunctive orders would be that PADER and OSM are "free to disregard state adjudications and final judicial

16

decisions so long as they are not injunctions." 172 IBLA at 125 (Jackson, J., dissenting). Not only would PADER and OSM be free to disregard state adjudications, but under the Board's analysis they would be required to disregard the adjudications. This interpretation renders the cooperative federalism that Congress intended a mere formality, because state agencies would be required to disregard state adjudications on the basis that the OSM continues to regard a violation to exist despite the state adjudication. The OSM does not have authority to conduct a *de novo* review of state adjudications. Rather it can only consider whether the decisions are arbitrary, capricious or an abuse of discretion. 30 C.F.R. §842.11(b)(1)(ii)(B)(2). "[OSM] concludes that good cause exists for the regulatory authority not acting only where the order has a proper basis. Such a basis would exist if the temporary relief criteria of the state program are satisfied or if the state court concluded the violation does not exist." 52 Fed. Reg. 26,739. Thus, the correct analysis is not whether an injunctive order exists, but rather is whether the state order had a proper basis and was not arbitrary, capricious or an abuse of discretion.

The question then becomes whether the PAEHB's decision that PADER failed to prove Hamilton responsible for the Grimes Run discharges was arbitrary, capricious, or an abuse of discretion in finding no violation existed. There is no dispute that the PAEHB's decision to vacate PADER's Compliance Order was based upon a finding of insufficient evidence to prove Hamilton responsible. This lack of evidence is primarily due to the ruling by the PAEHB that PADER's map was inadmissable as evidence. The Board found that since the evidentiary ruling affected the outcome of PADER's enforcement, the PAEHB's decision did not have a proper basis for finding no violation. 172 IBLA at 109. "There is little doubt that PAEHB could have found that the AMD was either located within Hamilton's permitted area or hydrogeologically connected to its mining

17

operations if the photocopy of the permit map had not been excluded from evidence." *Id.* at 107 n.23.

In his dissent, Judge Jackson viewed the Board's analysis of the evidentiary ruling to be an

invalid *de novo* review of the state adjudication, stating:

> It is hard to imagine a greater intrusion into the role of the states than
> our second guessing their evidentiary rulings under Pennsylvania law,
> as made by the PAEHB Chairman, the full PAEHB, and the
> Pennsylvania Commonwealth Court. To go further and engage in a
> *de novo* review of the evidence presented by PADER, as suggested by
> the Government, would significantly exceed OSM's limited oversight
> responsibilities in a state with an approved program under 30 U.S.C.
> §271(a)(1).

172 IBLA at 126.

The OSM and the Board are not permitted to simply disagree with the PAEHB's decision,

rather, the evidentiary rulings that are attacked must be attacked as being arbitrary, capricious or an

abuse of discretion. 30 C.F.R. §842.11(b)(1)(ii)(B)(3).

The record is clear that Inspector Isaacson, upon whose findings the NOV was based, never

considered whether the PAEHB's evidentiary ruling was arbitrary or capricious. Inspector Isaacson

never even read the PAEHB's decision, instead replacing the PAEHB's decision with his own, based

upon his observations and conclusion that the discharges existed. Similarly the Board stated that the

PAEHB's decision could not have been a "proper basis" because it would have the effect of

precluding PADER from requiring Hamilton to treat the six Grimes Run discharges. Here, the Board

was simply stating that an outcome they disagreed with was justification for finding the PAEHB's

decision lacked a "proper basis."

The Secretary has not argued that the PAEHB's evidentiary rulings were arbitrary, capricious

or an abuse of discretion. In fact the Secretary has argued that such a sophisticated analysis cannot

18

be expected to be conducted by the OSM, where the OSM still has the responsibility to see violations treated. However, it is not unworkable for the OSM to conduct some level of review of a state agency's decision before the OSM makes a decision on whether said decision has a "proper basis."[4] It is then arbitrary, capricious and an abuse of discretion for the OSM to have declared the PAEHB's decision lacked a "proper basis," and the Board affirming OSM's findings is plainly erroneous. To that end, the Board's determination that the PAEHB's decision lacked a "proper basis" is plainly erroneous and PADER's failure to act based upon the PAEHB decision must be considered to be "good cause."

## C. STANDING TO CHALLENGE

The Secretary seeks to revive an argument that Hamilton lacks standing to challenge the authority of the OSM to issue the NOV. The Board held that a operator does have standing to challenge the OSM's authority to issue an NOV, however, the burden of production and proof of lack of authority rests with the operator:

> The TDN process contemplates formal communications between OSM and the State regulatory authority; the operator does not participate. *See Patrick Coal Co. v. OSM*, 661 F.Supp. 380, 384 (W.D. Va. 1987). Nevertheless, although an operator's only vehicle to complain about issuance of a TDN is to obtain administrative review of any resulting NOV or CO (*Lonesome Pine Energy, Inc. v. OSM*, 156 IBLA 182, 191 (2002)), it is free to establish in the context of such proceeding that OSM lacked authority, specifically including whether or not, prior to a TDN the State regulatory authority had failed to take appropriate action or subsequently did not offer good cause for its failure to do so. *Turner Brothers, Inc. v. OSM*, 101 IBLA at 87. . . We conclude accordingly that it is the applicant for review

---

[4]Where the OSM has determined that there is an imminent danger to the health or safety of the public or can reasonably expect significant, imminent environmental harm to land, air or water resources, the OSM may issue an NOV regardless of ongoing State action. 30 U.S.C. 1271(a)(2). Thus, a review of the State agency decision does not constrain the OSM's ability to enforce violations requiring emergency enforcement and therefore said review would not be unworkable.

> of the notice of violation that bears the burden of going forward and
> the burden of persuasion on the issue of whether OSM overstepped
> the bound of its oversight authority . . . .

172 IBLA at 103. Despite the fact that the Board held that Hamilton could challenge the NOV on

the basis of 30 C.F.R. §842.11(b)(1)(ii)(B)(2), and that the Board speaks for the Secretary, the

Secretary now seeks to argue that the "better and more reasonable interpretation" is that the operators

have no standing because the TDN process imputes no benefit to the them. However, the standard

on appeal does not let this court consider what is the best, most reasonable interpretation; rather, the

Court considers only whether the decision of the Board is plainly erroneous and clearly inconsistent

with law. To that end, the Board's decision that Hamilton had standing is not plainly erroneous.

## IV. CONCLUSION

Since the Board's decisions as to "appropriate action"and "good cause" were plainly

erroneous and inconsistent with other regulations, Hamilton's motion for summary judgment is

granted and the Secretary's motion is denied. Furthermore, since OSM lacked authority to issue the

NOV, it must be vacated. An appropriate order follows.

AND NOW, this 16th day of March, 2009, for the reasons set forth in the accompanying Opinion, it is HEREBY ORDERED that the Al Hamilton Contracting's Motion for Summary Judgment (Docket No. 12) is GRANTED and the Secretary of the United States Department of the Interior's Motion for Summary Judgment (Docket No. 14) is DENIED.

IT IS FURTHER ORDERED that Federal Notice of Violation No. 94-121-337-01 is HEREBY vacated.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

21